```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


TattleTale Alarm Systems, Inc.,:

         Plaintiff,            :     Case No. 2:10-cv-226

    v.                         :
                                     JUDGE EDMUND A. SARGUS, JR.
Calfee, Halter & Griswold, LLP,:     Magistrate Judge Kemp
et al.,

         Defendants.           :
```

OPINION AND ORDER

On November 29, 2010, plaintiff TattleTale Alarm Systems, Inc. filed a motion to compel discovery which relates to documents for which a privilege is claimed.  In accordance with a briefing schedule set during a telephone conference, defendant Calfee, Halter & Griswold, LLP filed its memorandum in opposition on December 10, 2010, and also submitted to the Court a box of documents for *in camera* review.  TattleTale filed a reply memorandum on December 17, 2010.  For the following reasons, the motion to compel will be denied.

I. Summary of the Parties' Positions

This case involves claims of legal malpractice against Calfee, Halter & Griswold, a law firm, and relates to the non-payment of maintenance fees for a patent held by TattleTale. TattleTale claims that the Calfee firm had assumed responsibility for insuring that the fee was paid but that it failed to do so, resulting in the premature lapse of the patent.

It is understandable that in a case in which a law firm is a party, issues of privilege will arise.  Here, after Calfee was asked to produce documents relating to its representation of TattleTale and the payment of the maintenance fees, it produced a privilege log which indicated that over 300 responsive documents

were being withheld on grounds of privilege. According to Calfee, most, if not all, of the documents for which it has claimed privilege relate to its loss prevention efforts after it became aware that TattleTale might assert a malpractice claim against it. Some of them concededly post-date the termination of the attorney-client relationship between TattleTale and Calfee, and some involve communications with outside counsel.

TattleTale does not appear to take issue with the proposition that documents created in anticipation of litigation from a client, and which may reflect the law firm's need for legal advice, can be privileged, especially if those documents reflect communications which occurred after the attorney-client relationship has ended. It asserts, however, that any such documents which came into being during the time period when it and Calfee still had an attorney-client relationship may not properly be withheld. In its memorandum supporting the motion to compel, TattleTale points out an apparent disagreement with Calfee as to the date the relationship ended and cites case law supporting its argument that the relationship continued after September 6, 2005, the date on which Calfee sent it a termination letter. TattleTale also suggests various reasons why an *in camera* review of the documents is needed.

In response, Calfee argues that the cases cited by TattleTale holding that "loss prevention" communications occurring during the existence of the attorney-client relationship are not privileged do not accurately reflect Ohio law, and that communications either with outside counsel or among attorneys within the firm on that subject are privileged no matter when they occur. It argues strenuously that the Ohio courts have not recognized such an exception to the attorney-client privilege and that this Court ought not to create one.

In its reply, TattleTale contends that every court which has

-2-

addressed this precise issue has held that the privilege may not be asserted for these types of communications because, at least during a time when the law firm owes fiduciary obligations to its client (that is, while the attorney-client relationship still exists), it is a conflict of interest for the firm to engage in privileged communications about the client which are adverse to the client's interests, and this conflict of interest vitiates the otherwise privileged nature of such communications.  It also argues that Calfee continued to provide services on the matter in question for a week or two after Calfee sent it a letter dated September 6, 2005, purportedly ending the attorney-client relationship, and that Calfee continued to represent it on other matters up to October 25, 2005.  Thus, there is a disagreement between the parties as to the precise date when their attorney-client relationship ended.

     The motion, response and reply thus present two discrete issues for resolution: (1) when did the attorney-client relationship between TattleTale and Calfee end; and (2) are "loss prevention" communications concerning a present client which take place during the attorney-client relationship exempted from production through the operation of the attorney-client privilege when it is the client which has requested those communications? The Court need address the first issue only if it answers the second question in a way which favors TattleTale, so it will deal with the privilege issue first.

     II. <u>Are "Loss Prevention" Communications Privileged?</u>

     There are a number of conceptual questions which must be answered before the Court delves into the issue of whether "loss prevention" communications made during the existence of an attorney-client relationship are privileged or are discoverable at the request of the client.  One threshold issue is which law applies: federal or Ohio.  Another conceptual question posed by

the motion to compel is where to begin the analysis - that is, should the Court be considering whether TattleTale is asking the Court to recognize an exception to the attorney-client privilege, or is Calfee asking the Court to extend the privilege to communications not ordinarily within its scope? The Court will now discuss each of these questions.

### A. Ohio Law Governs this Dispute

As far as choice of law is concerned, the parties take different positions, even though both recognize that the beginning point of the analysis is Fed.R.Evid. 501. That rule provides that federal common law governs the question of privilege unless "State law supplies the rule of decision" on the claim at issue; if that is so, "the privilege ... shall be determined in accordance with State law." Here, the claim on which TattleTale has sought discovery is its legal malpractice claim. Although that is clearly a state law claim, the complaint alleges jurisdiction based on the presence of a federal question, presumably a patent law question which is subsumed within the malpractice claim. As a result, TattleTale argues that the federal law of privilege applies even though its malpractice claim sounds in negligence.

The key language contained in Rule 501 is the phrase "supplies the rule of decision." It seems clear that, at least as to the malpractice claim, state law supplies the rule of decision because it defines the elements of legal malpractice. In a somewhat similar case, where federal jurisdiction also depended upon the existence of a patent law question subsumed within a legal malpractice case, the Court of Appeals plainly stated that the "cause of action for legal malpractice arises under Ohio state law." Davis v. Brouse McDowell, L.P.A., 596 F.3d 1355, 1359 (6th Cir. 2010); see also Warrior Sports, Inc. v. Dickinson Wright, P.L.L.C., __ F.3d __, 2011 WL 95332 (Fed. Cir.

2011). Thus, assuming for purposes of this opinion that federal question jurisdiction exists here, state law still "supplies the rule of decision" on the malpractice claim, and it therefore governs the resolution of the privilege claim. In any event, however, the Court agrees with TattleTale that the result in this case is not likely to differ depending upon whether the Court uses Ohio law or federal common law as the basis for its analysis.

    B.  <u>TattleTale is Asking for an Exception to be Created</u>

    Having found that Ohio law governs the parties' dispute about privilege, the next question is whether, if the Court were to hold that the "loss prevention" communications are shielded from discovery by the attorney-client privilege, that would be an extension of the privilege to a situation which it ordinarily would not cover, or whether the attorney-client privilege, as defined in Ohio law, by its terms applies to such communications, so that what TattleTale is asking the Court to do is to create an exception to the privilege. This does make some difference in the analysis because, as both parties acknowledge, there are no Ohio cases precisely on point, and the Court's willingness or reluctance to expand Ohio law will depend to some extent on which decision - favoring TattleTale or favoring Calfee - would be an expansion of existing law.

    On this question, the Court also concludes that Calfee has the more persuasive argument. Under Ohio law, an attorney is prohibited from testifying about "a communication made to the attorney by a client in that relation or the attorney's advice to a client ...." Ohio Rev. Code §2317.02(A)(1). Ohio common law supplies a similar privilege to situations not covered by the statute. Ohio has recognized eight separate components to the common law privilege; foremost among them are the fact that legal advice has been sought from a professional legal adviser and that

-5-

the communications in question were made, in confidence, for the purpose of obtaining that advice. If that is so, unless the privilege is waived, those communications are protected from disclosure by both the client and the lawyer. State ex rel. Leslie v. Ohio Hous. Fin. Agency, 105 Ohio St. 3d 261, 265 (2005), quoting Reed v. Baxter, 134 F.3d 351, 355-56 (6th Cir. 1998).

There is nothing exceptional about the proposition that individual attorneys within a law firm may seek legal advice from their colleagues about either personal matters or matters relating to the firm's interests, and that when they do so, they stand in a client relationship to the attorney whose advice has been sought. See, e.g., Nesse v. Pittman, 206 F.R.D. 325, 328 (D.D.C. 2002). The fact that the attorneys seeking advice also represent a client with potentially conflicting interests is logically irrelevant to whether those attorneys can retain counsel and become clients. It is clear that they may do so and, in fact, TattleTale appears to concede that they did so in this case because it argues that the attorneys who sought loss prevention advice were attempting to further their and Calfee's interests and not the interests of their client. It seems indisputable that the relationship created between these lawyers and the attorneys they consulted is a classic attorney-client relationship which carries with it all of the usual ethical and fiduciary duties, including the ability to communicate confidentially about the matter upon which legal advice has been sought. Thus, all of the elements of attorney-client privilege - a communication, between a client and an attorney, for the purpose of seeking legal advice, made during the existence of an attorney-client relationship - are present when the typical "loss prevention" communication takes place. Consequently, TattleTale is asking the Court to recognize an exception to the privilege

for these types of communications based on the fact that they took place at the same time that the attorney or law firm was representing the client about which a "loss prevention" issue has arisen.  This conclusion requires the Court to examine Ohio case law to determine under what circumstances Ohio courts are willing to create exceptions to the attorney-client privilege.

        C.   <u>Ohio Would not Imply an Exception Here</u>

Ohio has not recognized a large number of exceptions to the attorney-client privilege.  Two of the ones which are recognized are the "crime-fraud exception" and the "self-protection exception."  The Ohio Supreme Court has stated that the recognition of this latter exception "aids the administration of justice and is supported by decisions of other jurisdictions," see <u>Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.</u>, 127 Ohio St. 3d 161 (2010), and recognition of the former reflects a policy determination that advice sought and rendered in relation to "some future unlawful or fraudulent transaction" is "not worthy of protection ...."  <u>Moskovitz v. Mt. Sinai Med. Ctr.</u>, 69 Ohio St. 3d 638, 661 (1994).  The <u>Moskovitz</u> court recognized a third exception, based on the same rationale, for documents that bear on the issue of whether a party or insurer has failed to make a good faith effort to settle a case, describing such documents as "wholly unworthy of the protections afforded by any claimed privilege."  <u>Id</u>.  The same reasoning supports the holding in <u>Boone v. Vanliner Ins. Co.</u>, 91 Ohio St. 3d 209 (2001) that, in insurance bad faith actions, claims file materials are not exempt from disclosure on the basis of attorney-client privilege.  It is helpful to note that, as to the policies which underlie the attorney-client privilege and which therefore inform the inquiry into what types of materials are worthy of protection, the <u>Boone</u> court cited with approval the policy reasons behind the privilege as articulated in <u>Upjohn Co.</u>

v. United States, 449 U.S. 383, 389 (1981), which are "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  Boone, 91 Ohio St. 3d at 210 n.2.  This is the framework within which this Court must decide (or predict) whether the Ohio Supreme Court would recognize the exception which TattleTale advocates here.  See Clutter v. Johns-Manville Sales Corp., 646 F.2d 1151, 1153 (6th Cir. 1981)(the district court must "ascertain from all available data what the state law is and apply it").

　　On a fairly general level, it appears that Ohio courts will create an exception to the attorney-client privilege in at least two circumstances.  First, as with the crime-fraud exception, the courts will determine if the communications sought to be protected serve any societal value.  If not, they will not be protected.  Second, on a more general level, the courts will determine if applying the privilege to certain types of communications furthers the policy goals articulated in Upjohn.  Upjohn, as noted, recognizes that open communication between clients and lawyers is essential so that lawyers can give legal advice on the basis of full and complete information.  In most cases, the rendering of sound legal advice furthers societal goals in the fair administration of justice.  Third, the Ohio Supreme Court has shown a tendency not to apply the privilege in cases where it would effectively prevent a party from proving his or her case because all, or at least the bulk, of the most relevant evidence is contained in privileged communications.  This explains the creation of the self-protection, bad faith, and good faith settlement exceptions, because in each of those situations, absent the ability to discover or utilize otherwise privileged communications, the affected party lacks the ability to put on probative evidence in support of his or her claim or

-8-

defense.  Thus, these exceptions fall within a "rule of necessity" which values the ability to prove a particular claim over the protection usually afforded by the attorney-client privilege.  See, e.g., Moskovitz, supra ("Often, the only way for a party to prove another party's failure to make a good faith effort to settle is by obtaining the claims file of an insurer").

Here, it can hardly be argued that loss prevention communications are of the same character as communications about contemplated fraudulent or criminal behavior, so the reasons which led to the creation of the crime-fraud exception are simply inapplicable.  As to the question of what values are served by applying the privilege to loss prevention communications, individual lawyers who come to the realization that they have made some error in pursuing their client's legal matters should be encouraged to seek advice promptly about how to correct the error, and to make full disclosure to the attorney from whom that advice is sought about what was done or not done, so that the advice may stand some chance of allowing the mistake to be rectified before the client is irreparably damaged.  If such lawyers believe that these communications will eventually be revealed to the client in the context of a legal malpractice case, they will be much less likely to seek prompt advice from members of the same firm.  While consultation with outside counsel might be a fair substitute in some cases, by the time a matter has progressed to the point where outside counsel are called in, it may be too late to protect the client from damage. All of this suggests that, as a practical matter, there are societal values to be served by allowing members of a law firm to converse openly and freely about potential mis-steps in their representation of a client without worrying about whether the client will eventually be able to use those communications to the lawyer's disadvantage.

It is true, also, that the "rule of necessity" which explains <u>Moskovitz</u> and <u>Boone v. Vanliner Ins. Co.</u> has little force in this situation.  It is simply not the case that a legal malpractice plaintiff will be functionally unable to prove negligence without gaining access to intra-firm communications made during loss prevention efforts.  The client still has access to every communication between the client and the firm and to every communication made by the lawyer, whether within the firm or outside of it, that reflects how the lawyer was carrying out the client's legal business.  It is hard to conceive of a case where the only evidence of legal malpractice is found within the firm's loss prevention communications.  As it relates to this case, especially given the nature of TattleTale's claim - a simple failure to pay patent maintenance fees in a timely fashion - it cannot be said that TattleTale will be unable to collect and put on substantial probative evidence unless it is given access to Calfee's loss prevention communications.  Thus, while the existence of a common law tort for legal malpractice is an indication that Ohio values such a claim (just as it values prejudgment interest proceedings under Ohio Rev. Code §1343.03 and insurance bad faith claims), the ability to pursue and prove that type of claim is not so substantially undermined by recognition of the attorney-client privilege for loss prevention communications that such claims will founder for lack of proof.

It might be argued, however, that such communications are not, to use the Ohio Supreme Court's phrase, "worthy of protection" because they were made in the situation where the law firm has developed a conflict of interest with its client but does not discharge its ethical duty to disclose the conflict and obtain the client's consent to the conflicting representation.  As the ensuing discussion of cases from other jurisdictions explains, that theory may well underlie some courts' willingness

-10-

to carve out an exception for these types of communications. However, the Court has seen no evidence that an Ohio court would exclude certain communications from the ambit of the attorney-client privilege simply due to the lawyer's alleged misconduct or breach of an ethical duty. Consequently, whether these communications would ultimately be deemed unworthy of protection would, at the very least, depend on a more comprehensive analysis of the benefits and detriments which would flow from either applying the privilege or permitting disclosure of the communications. That conclusion leads the Court into a discussion of the cases which TattleTale has identified as supporting the creation of an exception for loss prevention communications, because the Court might be persuaded that those cases follow a method of analysis which would appeal to the Ohio courts and fit within the parameters under which those courts have created exceptions to the privilege.

    The case which both parties cite to most extensively is a District Court decision from the Eastern District of Pennsylvania, <u>Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.</u>, 212 F.R.D. 283 (E.D. Pa. 2002). That case was a legal malpractice action where, during the attorney-client relationship, the client became dissatisfied with its attorneys' representation of it as a secured creditor both prior to and during the debtor's bankruptcy. The lawyers performing that work consulted with other attorneys in the same firm about the client's unhappiness, including the potential for a malpractice case to be filed. The communications were reflected in documents which, once the malpractice suit was filed, became the subject of a discovery dispute. Although the type of malpractice alleged in this case differs from the type involved in <u>Koen Book Distributors</u>, the legal issues relating to discovery of "loss prevention" documents appear to be identical

-11-

in both.

Analyzing the question under Pennsylvania law, the court began with the proposition, which it derived from the decision in <u>In re Sunrise Securities Litigation</u>, 130 F.R.D. 560 (E.D. Pa. 1989), that it was unethical for lawyers within a firm to consult with each other for the purposes of advancing or protecting their own interests at the same time they represented a client who might ultimately be suing them because undertaking this potentially conflicting representation would violate the fiduciary duty owed to the existing client.  That being so, the court reasoned (again in reliance on the <u>Sunrise</u> decision) that if such communications actually occurred, they created a conflict of interest within the firm that "vitiated" any attorney-client privilege which would otherwise attach to those communications.

While that conclusion would appear to have been dispositive, the court then proceeded to a discussion of what it termed the "seminal" case of <u>Valente v. Pepsico, Inc.</u>, 68 F.R.D. 361 (D. Del. 1975), a case involving a shareholder dispute among the shareholders of Wilson's Sporting Goods.  It turned out that the same law firm had provided legal services both to Wilson and to Pepsico, one of the disputing shareholders, which representation the court determined to be a conflict of interest.  In ordering that certain otherwise privileged documents created by the attorney be produced during discovery, the court concluded that it was a "'universally recognized'" exception to the privilege "'that where an attorney serves two clients having common interest and each party communicates to the attorney, the communications are not privileged in a subsequent controversy between the two ....'"  <u>Koen Book Distributors</u>, 212 F.R.D. at 285, <u>quoting Valente</u>, 68 F.R.D. at 368.  Applying that principle and the precepts it derived from <u>Sunrise</u>, the <u>Koen Book Distributors</u> court held that "the law firm was in a conflict of

interest relationship with its clients" when lawyers within the firm consulted with each other about loss prevention issues, and that in a subsequent dispute with the client (but not in the context of a dispute with a third party), the privilege could not be asserted to shield the documents from discovery.  Koen Book Distributors, 212 F.R.D. at 286.  The court responded to the policy arguments advanced by the law firm in favor of recognizing the privilege by stating that the firm, if it wished to communicate about the potential malpractice case in a privileged fashion, could have withdrawn from its representation of the client before engaging in any loss prevention communications, or it could have solicited the clients' consent to the conflicting representation.  Having done neither, the court refused to allow it to withhold the documents on privilege grounds.

     As TattleTale points out, Koen Book Distributors has been cited favorably by a number of other courts.  Many of these decisions are discussed in depth in Asset Funding Group, LLC v. Adams & Reese, LLP, 2008 WL 4948835 (E.D. La. November 17, 2008), and include a District Court decision from the Northern District of California, Thelen Reid & Priest, L.L.P. v. Marland, 2007 WL 578989 (N.D. Cal. February 1, 2007), and a Bankruptcy Court decision from the same District, In re SonicBlue, Inc., 2008 WL 170562 (N.D. Cal. January 18, 2008).  This latter decision provides the best summary description of the proposition being advanced by Tattletale: "a law firm cannot assert the attorney-client privilege against a current outside client when the communications that it seeks to protect arise out of self-representation that creates an impermissible conflicting relationship with that outside client."  Id. at *9.  The District of Massachusetts has also weighed in on the issue, concluding, in Burns ex rel. Office of Public Guardian v. Hale and Dorr LLP, 242 F.R.D. 170, 173 (D. Mass. 2007), that none of the three

purposes of the attorney-client privilege would be furthered by allowing a law firm to withhold disclosure of documents which were relevant to a client's potential malpractice claim against the firm.

Calfee acknowledges that, from a case law perspective, there is not much on the other side of the ledger. However, it argues that the cases relied on by TattleTale are not from Ohio, and that no Ohio court has either recognized this exception to the attorney-client privilege or is likely to do so. It also makes a number of policy arguments against recognizing such an exception.

The Court will begin its resolution of this issue by examining the source of the "first premise" underlying the decision in Koen Book Distributors, which is Valente's holding that the existence of a conflict of interest between clients represented by the same attorney disables the attorney from withholding otherwise privileged information from either of them. Valente has not been without its critics. In Deutsch v. Cogan, 580 A.2d 100 (Del. Ch. 1990), also a case in which a law firm represented the interests of conflicting shareholders in the same corporation, the court rejected any *per se* application of Valente to the situation where such an apparent conflict of interest existed, noting that Valente had been described by some as an "'aberrant'" decision, id. at 106. The court instead applied a balancing test which, among other things, placed the burden on the party requesting discovery to demonstrate good cause why the privilege should not be applied. See also Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970). The court did not actually conclude that Valente was wrongly decided, reasoning that the Valente court could have done the kind of balancing of interests required by Garner and could have concluded that, given the clear conflict of interest involved there, the results of that analysis favored dispensing with the attorney-client

privilege.  Still, given the fact that Valente has been questioned by other courts as well, see, e.g., Panter v. Marshall Field Co., 80 F.R.D. 718 (N.D. Ill. 1978), it seems reasonable to conclude that any decision which relied upon Valente as stating an absolute rule - which appears to be the way that Koen Book Distributors interpreted it - merits a closer look.

Valente deals with one fairly common example of a situation in which the same attorney ends up representing clients with adverse interests - that is, when a shareholder dispute develops, and the attorney has, to that point, been representing the interests both of the corporation and of a large shareholder. The situation presented in this case is simply a variation on that theme.  In discussing the principles involved in that type of conflicting situation, although in a different factual context, at least one court has cited a legal principle which is exactly the opposite of the principle underlying Valente (and, by extension, Koen Book Distributors and its progeny).  In a thoughtful discussion of the perils and consequences of joint representation, the Court of Appeals for the Third Circuit, in In re Teleglobe Communications Corp., 493 F.3d 345 (3d Cir. 2007), noted that when the representation of clients with common interests evolves into the representation of clients with conflicting interests, the proper course of action for the attorney to follow is, of course, "to end the joint representation."  When that does not happen, however, an issue arises as to the privileged status of the communications which took place with each client after their interests diverged. There, the court said, "the black-letter law is that when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct."  Id. at 368, citing, inter alia, Eureka Inv. Corp. v. Chicago Title Ins. Co., 743 F.2d

932, 937-38 (D.C. Cir. 1984); 8 J. WIGMORE, EVIDENCE §2312 (McNaughton rev. ed. 1961). Eureka, in turn, held that the attorney's failure to comply with ethical norms should not deprive the client of the benefit of the attorney-client privilege, and the court described this principle as "widely accepted." Id. at 369. The Teleglobe court did leave open the possibility that the party requesting the otherwise privileged documents might be able to show that the "fiduciary exception" flowing from the Garner case applied, and it remanded the case for further consideration of that issue. If nothing else, this line of cases shows that the relationship between an attorney's conflict of interest and the ability of each of the attorney's clients to assert that privilege against the other is the starting point of the analysis, rather than the ending point.

Because Teleglobe suggests that a Garner-type balancing analysis, rather than the application of a bright-line rule, is appropriate when any fiduciary has become involved in dealing with conflicting interests, the Court will put the current situation through that analysis to see if it might produce a result which would also be consistent with Ohio law. To do that requires a fairly thorough examination of Garner.

Garner was a securities fraud case which also involved derivative claims. Some of the plaintiffs' claims alleged wrongdoing on the part of the corporation in connection with the issuance and sale of stock. During the relevant time frame, the corporation was advised by its attorney with respect to these transactions. After suit was filed, the plaintiffs sought discovery of the communications between the corporate attorney and representatives of the corporation.

The parties in Garner took completely opposite positions on whether the privilege was applicable. Plaintiffs argued that the privilege can never apply in this situation because the

-16-

corporation owed them fiduciary duties and all of its communications were undertaken for their benefit.  To the contrary, the corporation (supported by the ABA as amicus curiae) argued that the privilege should always apply because it is always in the public interest for corporate managers to be able to consult freely with counsel about proposed transactions or courses of action, without the fear that the content of their communications would be revealed to shareholders in subsequent litigation.

The court chose an intermediate approach.  After reviewing various exceptions to the privilege, such as the crime-fraud exception, it concluded that when corporate wrongdoing was alleged, the shareholders should be entitled to breach the privilege if they could make an adequate showing of good cause.  The court identified various factors which, in the corporate shareholder context, touched on the issue of good cause, including the percentage of shareholders seeking relief, the apparent strength or weakness of their claims, the extent to which the misconduct alleged was criminal or unlawful, whether the communications related to past actions or contemplated ones, and whether there was proof available from other sources.  As a result, because the lower court had applied a simpler, bright-line approach and refused to apply the attorney-client privilege to the communications in question, the case was remanded for review of these various factors.

Of course, because the issue has arisen here in a somewhat different context, not all of these factors can be evaluated in deciding if TattleTale has made the type of "good cause" showing which would justify disregarding the privilege which would otherwise attach to Calfee's loss prevention communications.  However, some of them are equally applicable.  For example, the Court can evaluate the extent to which Calfee's alleged conduct

is either criminal or fraudulent; it can determine if the discussions related to conduct which had already been completed, or to a future course of action; and it can judge whether there are other readily available sources of proof on the same subject.

For many of the same reasons discussed above, none of these factors favor allowing TattleTale to have access to the communications at issue. There are other sources of proof; the discussions presumably involve, for the most part, actions or inactions which took place in the past, as opposed to proposed (and potentially illegal or fraudulent) actions; and the alleged conduct, while wrongful to the extent that it might be characterized as negligent, is not alleged to be criminal, illegal, or fraudulent. The Court also takes into account the fact that recognition of the privilege promotes the affected attorneys' ability promptly to seek advice and to obtain it based on a complete disclosure of the circumstances which led them to believe that some loss prevention communication was warranted. Consequently, under the Garner balancing test (which is concededly a federal common law standard), TattleTale has not shown good cause to obtain the documents.

While this conclusion, based on federal law, is not necessarily dispositive of the issue under Ohio law, the Court believes that the types of factors identified in Garner are similar to those evaluated by Ohio courts in deciding whether to create new exceptions to the attorney-client privilege. There is, therefore, a good chance that Ohio would follow the Garner approach in this situation. Consequently, a thorough review of federal decisions, including the ones which recognize the exception, persuades the Court that Ohio would enforce the attorney-client privilege for the loss prevention communications involved in this case. Coupled with the earlier conclusion that none of the factors identified in Ohio decisions would lead an

Ohio court to recognize this exception, the Court holds that it is inapplicable to this case.

### III. Conclusion and Order

The Court concludes that, under the specific facts of this case, an Ohio court would not create an exception to the attorney-client privilege for the documents in question. Therefore, TattleTale's motion to compel production of those documents (#37) is denied.

### IV. Procedure on Appeal

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.4.

/s/ Terence P. Kemp
United States Magistrate Judge